LAKE LBJ MUNICIPAL UTILITY
DISTRICT, Appellant,

v.

Bennett COULSON & C.A.E.,
Inc., Appellees.

Bennett COULSON, Appellant,

v.

LAKE LBJ MUNICIPAL UTILITY
DISTRICT, Appellee.

Nos. 14130, 14131.

Court of Appeals of Texas,
Austin.

April 20, 1988.

Rehearing Denied May 25, 1988.

J. Ron Young, Randall D. Wilkins, Rowe & Young, Houston, for Lake LBJ Mun. Utility Dist.

C. Charles Dippel, Sears and Burns, Houston, for Bennett Coulson & C.A.E., Inc.

Before POWERS, BRADY and ABOUSSIE, JJ.

POWERS, Justice.

Bennett Coulson and C.A.E., Inc. recovered judgment, after a jury trial, against Lake LBJ Municipal District in a suit for sums allegedly due under a written contract to furnish the District professional engineering services. The District appeals. We will reverse the judgment and remand the causes for a new trial.

## THE CONTROVERSY

In our previous consideration of this appeal, we held the trial court erred in failing to place the burden of proof on the Engineer to show that his plans and specifications met a reasonable standard of skill and diligence, when: (1) the Engineer sued *solely* on a theory that *he had fully performed* his contract; and (2) the contract failed to require any specific standard of workmanship. *Lake LBJ Municipal Utility District v. Coulson*, 692 S.W.2d 897, 907–908 (Tex.App.1985). The Supreme Court reversed our judgment, holding that the *District* had, in such a case, the burden to establish that the Engineer's plans and specifications *did not* meet a reasonable standard of skill and diligence *when the District pleaded as much* in defense of the Engineer's claim. *Coulson v. Lake LBJ Municipal Utility District*, 734 S.W.2d 649, 651–52 (Tex.1987). We refer to these earlier opinions for a description of the controversy.

We turn now to the District's remaining points of error, insofar as they have not already been determined. The interests of Coulson and C.A.E., Inc. being identical on appeal, we shall refer to them collectively as the "Engineer." We reverse the judgment and remand for a new trial based on *each* of the several errors discussed below.

## VIOLATION OF RULE AGAINST DIRECT COMMENTS ON THE WEIGHT OF THE EVIDENCE

The District objected to Special Issue No. 1 on the ground that the issue contained a statement that impermissibly commented on the weight of the evidence. The issue inquired as follows:

> Do you find from a preponderance of the evidence that during the time in question Coulson & Associates Engineers, Inc., furnished the Lake LBJ Municipal Utility District with sufficient plans and specifications for construction of a water system, a sanitary sewer system and drainage for the needs of such district, *and to secure approvals from appropriate governmental agencies,* under the circumstances then existing?

(emphasis added). The District contends the emphasized portion of the inquiry improperly focused the jury's attention on an

undisputed matter—it was undisputed that the pertinent government agencies *had* approved the plans and specifications—in a way calculated to lead the jury to give an affirmative answer to the special issue.

The Engineer responds that the Supreme Court decided this point of error adversely to the District in its appellate review. The Supreme Court stated in its opinion that "Issues 1 and 6 properly placed the respective burdens and fairly submitted the respective claims of Coulson and the District." 734 S.W.2d at 652. The opinion did not, however, purport to address whether either of these issues contained an impermissible comment on the weight of the evidence. We hold accordingly.

■ The Engineer also contends the District waived its point of error by a lack of specificity in its objection. At trial, the District objected that the passage—"to secure approvals from appropriate governmental agencies under the circumstances then existing"—constituted an impermissible comment on the weight of the evidence, stating that the passage would mislead the jury into believing that "the only standard of care was to receive approval from the appropriate governmental agencies." We believe this objection, which specifically identified and attacked the offending language as a comment on the weight of the evidence, was made in proper form and explained with reasonable clarity the basis of the District's objection. We hold the

objection was sufficient to preserve the point of error.[1]

Having determined that the point of error is properly before us for adjudication, we shall now consider the merits of the District's contention.

Approval of the plans and specifications by a governmental agency was not a controlling issue in the case. *See, e.g., Black v. Acers*, 178 S.W.2d 152 (Tex.Civ.App. 1943, writ ref'd n.r.e.). The uncontradicted evidence showed that the submitted plans *received* governmental approval, except for a few instances where the Water Commission had not yet approved the proposed plans before the Engineer's employment was terminated by the District. *Whether* such approval had been given was *never* disputed in the case.

The parties *did* dispute, vigorously, *the proper weight* to be accorded such governmental approval in deciding the ultimate issue of whether the Engineer's work met the quality-of-work standard required by his contract. Thus, the *jury* were asked to decide *what weight* to assign such governmental approval in determining the ultimate issue of whether the plans complied with the standard of work required by the Engineer's contract. A careful reading of the entire record, including thirteen volumes of testimony, reveals that the Engineer (Bennett Coulson) and the District's witnesses (Lynn Willis, Jerry Hart, James Robert Jones, David W. Gray, Carlos Win-

---

1. Our holding that an objection is sufficient to preserve error does not depend upon whether the complaining party or his opponent relies on the erroneous issue. "Objections are used, in general, when the form of a *submitted special issue,* definition or explanation *is affirmatively erroneous;* . . ." (emphasis added). 3 McDonald § 12.26, at 328 (1983); *see also* Tex.R.Civ.P.Ann. 274 (Supp.1988) ("Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleadings, is waived unless specifically included in the objections."). We discern no conflict between this rule and Tex.R.Civ.P.Ann. 278 (Supp.1988), which provides that:

Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and *tendered* by the party complaining of the judgment; provided, however, that objec-

tion to such failure shall suffice in such respect if the question is one relied upon by the opposing party.

*Id.* (emphasis added).

The quoted portion of Rule 278 is derived from former Rule 279, which dealt with omitted issues. The current Rules 278 and 279 are still counterparts in the sense that both deal with omitted issues; Rule 278 applies when the losing counsel *did* make an objection to the omission and the trial court failed to make a submission, while Rule 279 applies when the losing counsel *did not* make a request or objection. Our situation does not involve the trial court's *failure to submit* an issue, but rather the court's *submission* of a defective issue. Therefore, Rule 278 does not apply and the tendering of a substantially correct issue is not a requisite to preserving the error. The District's objection was, therefore, sufficient to preserve the error for which it contends on appeal.

ter McCarty, Allen G. Martinets, and Henry Carl Bain) gave different and conflicting testimony concerning the meaning and importance of such governmental approval on the issue of whether the Engineer performed his work to the standard required by his contract.

■ Texas R.Civ.P.Ann. 277 (Supp.1988) provides:

> The court shall not in its charge comment directly on the weight of the evidence or advise the jury of the effect of their answers, but the court's charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence or advises the jury of the effect of their answers when it is properly a part of an instruction or definition.

In accordance with this rule, a trial court may not single out an isolated item of evidence and charge the jury on this evidence in such a way as to constitute a comment *on its importance* as compared to *all* the evidence on the point in issue. A special issue that suggests a trial judge's opinion concerning a matter the jury must decide—the importance of an item of evidence, for example—is a "direct comment on the evidence."

■ However, even if the wording of a special issue constitutes an impermissible comment on the weight of the evidence, not every such comment is cause for reversal. *Alvarez v. Missouri–Kansas–Texas R. Co.,* 683 S.W.2d 375 (Tex.1984) (use of the phrase "not timely" in special issue submitting the issue of whether the defendant railroad was negligent in not applying its brakes was, at most, harmless comment). To constitute reversible error, the record must show that the error was reasonably calculated to and probably did cause the rendition of an improper verdict. *Hydro–Line Mfg. Co. v. Pulido,* 674 S.W.2d 382 (Tex.App.1984, writ ref'd n.r.e.).

While the standard for reversal is high, a few cases have found comments on the weight of the evidence to be both erroneous and reversible error. For example, in *City of Pearland v. Alexander,* 483 S.W.2d 244 (Tex.1972), the controlling issue for the jury to determine was the amount of severance damages sustained by the landowners in an eminent-domain proceeding. A consideration in determining such damages was how the City planned to use the ten acres of condemned land, including the possibility that the City *might* use the site for a sewage plant. The court instructed the jury that the City *would* use the tract as a site for a sewage-disposal plant; and, in determining the before-and-after market value of the remainder, the jury was required "to presume that the City of Pearland will exercise its rights and use and enjoy this property *to the full extent for such a sewerage disposal plant." Id.* at 249. The Texas Supreme Court held this instruction to be a direct comment on the weight of the evidence and one that materially influenced the jury's market-value findings, requiring a reversal of the judgment that rested thereon. *Id.*

Similarly, in *Gleghorn v. City of Wichita Falls,* 545 S.W.2d 446 (Tex.1976) (per curiam refusal of an application for writ of error because no reversible error was shown) the Supreme Court pointed to two parts of a jury instruction: one part advised the jury that "the easement being taken ... *is to be used* for the purpose of being submerged by water collected and impounded ..." while the other part stated that the "rights include the right of being submerged by water." *Id.* at 448 (emphasis added). Although some evidence suggested that a possibility of infrequent flooding did exist, there was no evidence that water would permanently flood or submerge the area; consequently, the erroneous instruction required a reversal. *Id.*

In *Daniel v. Daniel,* 676 S.W.2d 666 (Tex.App.1984, writ ref'd n.r.e.), a will-contest case, appellant had attempted to establish the elements of a common-law marriage. The undisputed evidence showed that the testator and appellant had been previously married, divorced, and then resumed living together. *Id.* at 668. The special issue, submitted to the jury over objection and tender of a substantially correct issue by the appellant's counsel, inquired:

Do you find from a preponderance of the evidence that after their divorce in 1978, Raymond Daniel and Winnie Daniel agreed with each other to be husband and wife in a *new marriage?*

(emphasis added). The Court of Appeals held the words "new marriage" constituted a comment on the weight of the evidence and required reversal of the judgment. Even though neither party disputed that they had been previously divorced, the wording suggested erroneously that public awareness of the previous marriage and divorce was an element of a common-law marriage that the plaintiff was required to prove. *Id.* at 669.

From a reading of these cases, we infer the following general rule: if the court's comment casts a false light on the evidence, either through misrepresentation of the facts or the applicable legal standard, then the error is harmful and a reversal is required. We believe inclusion of the passage "and to secure approvals from appropriate governmental agencies" was a misrepresentation of the applicable legal standard *and* a statement that falsely emphasized the importance of such approval in deciding the controlling issue of whether the Engineer's work met the contract standard.

At this point, we should examine a line of decisions that seem on their face to contradict our holding that the trial court's comment amounted to reversible error. Two opinions might suggest that no harm results from the inclusion of an undisputed fact in a jury issue that inquires as to the existence of a disputed fact. *See Wells v. Hodges,* 604 S.W.2d 218 (Tex.Civ.App.1980, no writ); *Consolidated Underwriters v. Whittaker,* 413 S.W.2d 709 (Tex.Civ.App. 1967, writ ref'd n.r.e.). However, a careful examination reveals this conclusion to be erroneously simplistic. These decisions hold *only* that the inclusion of an undisputed fact is not reversible error *when the undisputed fact is not related to the disputed ultimate issue.*

For instance, in *Wells* a truck owner sued for the loss of his truck by theft resulting from the alleged negligence of the truck-stop owners with whom the owner had left the truck for servicing. 604 S.W.2d at 218. The court submitted a special issue inquiring whether: "Charlie's Truck Stop acting through an official or employee accepted the White truck and the trailer in question for a grease job, if the amount of business permitted." The court held that the passage—"if the amount of business permitted"—referred to the defendant's obligation to service the truck and did not refer to the disputed fact of *acceptance,* which the plaintiff was bound to show in order to establish a bailment. *Id.* at 220. Thus, *Wells* is distinguishable from the present case because, in *Wells,* the undisputed evidentiary fact that the court included in the special issue *did not* bear upon the material and disputed controversy about acceptance which the jury was required to decide.

Similarly, in *Whittaker* the court submitted the following special issue:

Do you find from a preponderance of the evidence that the injury sustained by the Plaintiff, Joe Whittaker, on or about the 30th day of July 1964 was a producing cause of any total incapacity, as that term has been defined herein?

This single issue referred to two material elements of the plaintiff's case: the "disability" issue, which was disputed, and the "producing cause" issue, which was undisputed. *Whittaker,* 413 S.W.2d at 711. The court found there could be no harm because the issue was answered in favor of the party relying on the uncontroverted fact. *Id.* at 715. Once again, *Whittaker* differs from the case before us because the undisputed fact that was included in the charge did not bear upon the controlling issue; thus, the inclusion of this fact would not have affected the jury's decision on the controlling issue.

In contrast, the erroneous comment in the present case involves an undisputed evidentiary matter that bore directly on the ultimate issue, *i.e.,* whether the Engineer's specifications were sufficient to meet the contract standard. The error was harmful because the court's comment falsely emphasized one evidentiary factor that bore

upon, but was not determinative of, the legal standard of whether the Engineer's work met the contract standard. We hold accordingly.

## THE ENGINEER'S COMPENSATION FOR PLANS AND SPECIFICATIONS

The District contends the trial court committed two distinct and separate errors in calculating the amount owed to the Engineer for his services. The District complains first that the trial court erred in awarding the Engineer 100% of the fee specified in the contract even though the pertinent projects were not constructed before the Engineer's employment was terminated.[2] Second, the District complains that the Engineer's compensation was calculated on the basis of 1979 prices for plans the Engineer submitted in 1973.

*Percentage of Basic–Fee Due Under the Contract*

The District contends that § 5 of the manual, which was attached to the contract,[3] establishes that 85% of the total basic charge for the Engineer's services is for completion of the plans and specifications while the remaining 15% of that charge is for supervisory services to be rendered by the Engineer in the construction phase of a project. For those projects in which the Engineer never supervised construction, the District reasons, the Engineer was entitled to only 85% of the total basic charge and not the extra 15% payable for construction supervision.

The District moved for judgment notwithstanding the verdict on the ground that no jury finding existed on the proper measure of damages and it objected to the proposed judgment. And, after judgment was rendered, the District moved to modify the judgment on the ground that it had the right under the contract to terminate the contract before the construction phase and to pay the Engineer for only his design-phase services; or, alternatively, on the ground that the Engineer had failed to introduce evidence showing the cost of his performing the pertinent construction-phase services, leaving the evidence insufficient for the calculation of the proper damages. The trial court overruled all these objections and awarded the Engineer 100% of the basic charge on all projects.

As a preliminary matter, the Engineer argues that we may not consider the District's point of error because the District did not plead ambiguity in the pertinent part of the contract. This misconstrues the point. The district *does not contend* the contract is ambiguous so that a court must determine *what* the contract language *means*. Rather, the District contends the contract language is *not* ambiguous—that it is reasonably susceptible of only *one*

---

**2.** In controversy is the Engineer's compensation for projects in "Horseshoe Bay West" and "Horseshoe Bay North," with respect to which he had prepared the plans and specifications. The parties stipulated, however, that no construction work had commenced on such projects when the District terminated the Engineer's employment. The amount in controversy is $19,457.04, or the sum of $14,955.66 for the water system, $1,859.33 for the sanitary-sewer system, and $2,642.15 for the drainage system.

**3.** The manual, published in 1963 by the Texas Society of Professional Engineers, is entitled *Manual of Professional Practices for General Engineering Service.* The manual was physically attached to the contract document and the contract refers to it in the following language:

> For this work the Consulting Engineer shall be compensated in accordance with the [manual] based on a percentage of the construction cost as detailed [in Section V of the manual]....

> The construction cost of the [water, sewage, and storm-sewer system] shall be computed, and the ... Engineer shall be paid the basic minimum fee for plans and specifications of the ... system *as specified in the* [*manual*], as *detailed* under Section V, Classification A, Page 8, a copy of which is attached hereto....

(emphasis added).
While the contract does not expressly incorporate any part of the manual, we believe the parties clearly intended this effect, at least relative to the calculation and payment of the Engineer's compensation for plans and specifications prepared for the District. We hold accordingly and will construe the contract and the attached manual as an entire instrument, insofar as they bear on the question of the Engineer's compensation, so that all related parts of each bear on each other and must be construed accordingly. *Smart v. Tower Land and Inv. Co.,* 597 S.W.2d 333 (Tex.1980).

meaning that the District requests the court to enforce. We turn then to consider whether this is the case.

In connection with each project, the contract provides in identical terms for the Engineer's compensation on the basis of a percentage of the "construction cost" of each project, the percentage varying with the cost as set forth in the attached manual.[4] Page 8 of the manual also provides:

> As a guide in establishing charges for the separate phases, the following allocation generally applies:
>
> | | |
> |---|---|
> | Preliminary and Design Phase | 85% |
> | Construction Phase | 15% |
> | Basic Charge | 100% |

Finally, the contract provides for payment to the Engineer of his "entire fee" upon completion of the plans and specifications and their submission to the District. The proper and harmonious interpretation of these two provisions—the "entire fee" language in the contract and the 85%/15% division in the manual—constitutes the issue before us in this point of error.

At oral argument, the Engineer suggested that the 85%/15% division merely prescribed the *timing of payments* and did *not* prescribe a method for calculating the *amount of compensation* earned by the Engineer. We reject this rather strained interpretation because § 5 of the manual clearly contemplates allocating the fee for the separate phases on the basis of the distinctly different *services required* of the Engineer during each of the separate phases.[5]

The Engineer argues alternatively that the terms of the contract and the manual are in conflict because "entire fee" necessarily means 100% of the basic minimum fee. As a matter of contract construction, if the Engineer is correct in his construction of the term "entire fee," then the typewritten terms of the contract would control the printed portions of the manual. *See McMahon v. Christmann,* 303 S.W.2d 341 (Tex.1957). Whenever possible, however, a court should interpret contract terms in a manner that will give effect to all the provisions of an agreement.

We do not believe the contract provision is inconsistent with the manual provision. For example, the manual specifically provides for *installment payments* to be paid the Engineer throughout the course of his work in the "Design Phase," *in accordance with periodic statements submitted by him to the District as the work in that phase progresses.* This course was followed by the parties. Therefore, we are compelled to believe the term "entire fee" refers simply to any balance owed the Engineer, on these periodic statements, at the time any phase is completed; and, conversely, the term was *not* intended by the parties to authorize the Engineer to recover for work in the "Construction Phase" that he never performed.

Our theory that the 85%/15% division necessarily refers to the amount owed for completion of each of the phases depends upon whether the contract *is* susceptible of such division and apportionment. A "divisible contract" is one that "is in its nature and purposes susceptible of division and apportionment, having two or more parts in respect to matters and things contemplated and embraced by it, not necessarily depend-

---

4. The manual describes the "Design Phase" as all work in the "Preliminary Phase" together with the following "Scope of Basic Services": (1) soil and foundation investigations and tests; (2) furnishing the engineering data necessary for routine governmental permits; (3) "[p]reparation of detailed contract drawings in pencil, on paper, and specifications for construction ..."; (4) "[p]*reparation of detailed cost estimates* and bidders' proposal forms for authorized construction"; and, (5) furnishing copies of the plans, specifications, notices to bidders, and bidders' proposals. (emphasis added).

5. Page 8 of the manual explains why no allocation is made between the Preliminary and Design Phases:

> A definite allocation between the Preliminary Phase and Design Phase cannot be established, since the preliminary services required vary considerably from project to project. As a general rule, however, the Preliminary Phase constitutes from 10 to 40 per cent of the total Basic Charge.

In light of this discussion, we find untenable the Engineer's explanation that the 85%/15% allocation is merely a "payment schedule." The manual clearly contemplates a correlation between the work performed and the payment due to the engineer for services rendered in the two primary phases.

ent on each other nor intended by the parties to be so." Black's Law Dictionary 250 (abridged 5th ed. 1983). An entire contract is one where "[t]he entire fulfillment of the promise by either is a condition precedent to the fulfillment of any part of the promise by the other...." *Id.* at 171.

The principal determinant on whether a contract is divisible or entire is the intent of the parties as manifested by the terms of their agreement. *McFarland v. Haby,* 589 S.W.2d 521 (Tex.Civ.App.1979, writ ref'd n.r.e.). A frequently used test for determining intent is whether the consideration for the agreement is apportionable; generally, a contract is divisible where one party's performance consists of distinct and separate items and the price required of the other party is apportioned to each item. *See Hamilton v. Texas Oil & Gas Corp.,* 648 S.W.2d 316 (Tex.App.1982, no writ); *Hamill v. Burleson,* 278 S.W.2d 571 (Tex.Civ.App.1955, writ ref'd n.r.e.). This factor is critically important in determining whether a building contract is severable. *See Michalowski v. Richter Spring Corporation,* 112 Ill.App.2d 451, 251 N.E.2d 299 (1969); *Board of Com'rs of Kingfisher County v. Vahlberg,* 198 Okl. 527, 180 P.2d 144 (1947).

In the present case, the contract provided for separate payments at the conclusion of the two major phases—the "Preliminary and Design Phase" and the "Construction Phase." These payments are roughly equivalent to the proportionate parts of the work required of the Engineer in each phase and the nature of his work in each phase is distinctively different.[6]

We hold the term "entire fee" refers to any balance owing at the completion of *each phase* on the various periodic state-

ments submitted by the Engineer; the contract is severable so that the Engineer is limited to 85% of the basic charge; and the trial court erred in awarding judgment for the full 100% of the basic charge when the Engineer performed no services in the Construction Phase. On remand, any subsequent judgment in favor of the Engineer, as to the projects where the Engineer did not perform construction supervision, should be limited to a recovery of 85% of the basic charge.

*Proper Date to Use for Determining Estimates*

The District contends the trial court incorrectly used the Engineer's 1979, estimates of competitive-bid costs in calculating his compensation. The Engineer maintains that September 23, 1979, is the correct date for the estimates based upon a 1973 amendment to the original contract. To resolve the issue, we will examine the 1973 contract and its 1979 amendment.

The 1973 contract required the Engineer to provide engineering services in connection with three of the District's projects: a water system, a sewage system, and a storm-sewer system. As explained earlier, the parties intended that the construction cost of each system should determine the amount of the Engineer's compensation, the construction cost being the variable factor in the compensation formula.[7] Ordinarily, the "cost of construction" was to be based on the "total competitive bid cost." However, "[i]f competitive bids are not obtained"—the situation that arises in this case—"then the [Engineer's] *estimate of reasonable competitive construction bid prices* [shall be] used to determine the construction cost and the applicable percentage fee." (emphasis added).

---

6. We hold the contract is unambiguous; therefore, evidence of the parties' conduct is irrelevant. However, we should note that the parties' actions were consistent with our interpretation in that, from 1973 until the submission of the last invoice in December 1979, the Engineer charged only 85% of the charge for the preparation of plans and specifications and charged the additional 15% for construction-phase services *only as construction progressed and he actually performed construction-supervision services.*

7. A conflict does exist between the definitions of "construction cost" in the contract and the manual. We believe the parties intended the typewritten terms of the contract to govern in the case of any such conflict. *See McMahon v. Christmann,* 157 Tex. 403, 303 S.W.2d 341 (1957).

The Engineer completed in 1973 the "Design Phase" on each of the three systems. As explained in footnote 3 of this opinion, the Engineer furnished the District, at that time, his "detailed cost estimates" pertaining to the construction of each system, as he was required to do by the contract. He also submitted in 1973 his statement for compensation due him under the contract, *calculated on the basis of the 1973 estimates* of construction cost. His 1973 statement was not paid, however, because the parties amended the contract in that year to delay the time his compensation was payable.

The pertinent parts of the 1973 amendment provide as follows:

> [The Engineer] will receive remuneration for services based on the fee schedule contained [in the original contract].
>
> 1. [The Engineer] hereby agrees to proceed with the preparation of plans and specifications ... to serve all the area of the district ... it being agreed and understood by the parties that district bonds will not be sold to finance those facilities until such time as the service is needed by property owners in the district.
> 2. The parties hereto agree that [the Engineer] will be entitled to receive payment for the preparation of the aforementioned plans and services related thereto only when district bonds are sold, provided however:
>
> \* \* \* \* \* \*
>
> (c) All fees will be due and payable at the time an annexation proceeding is initiated by any city, town or village of the State of Texas.
>
> (d) All fees owed to [the Engineer] will become due and payable at the end of five (5) years from the date bonds are approved by the Texas Water Rights Commission if said bonds or a portion thereof remain unsold.

These provisions deal solely with the *time* the Engineer's compensation becomes payable; they do *not* purport to alter the prescribed method of calculating the *amount* of his compensation as established in the original 1973 contract. Indeed, the 1973 amendment *expressly reaffirms* that the Engineer "will receive remuneration for services based on the fee schedule contained" in the original contract.

The original contract is clear and unambiguous, when supplemented by the manual attached to it, that the "detailed cost estimates" furnished by the Engineer should be the basis for calculating his compensation. Nothing in the 1973 amendment purports to vary these parts of the contract and attached manual, the Engineer was not obliged to furnish new estimates, and we see no indication that the Engineer is now entitled to increase his fee unilaterally and *sua sponte* based on increased prices in 1979 when the parties plainly contemplated the use of prices set out in estimates provided by the Engineer as required by the contract. Any delay in paying the Engineer was adequately compensated in yet another provision of the contract where the parties contracted for interest to be paid the Engineer on any past-due sums.

We hold the trial court erroneously calculated the Engineer's compensation, over the District's objections, based on the Engineer's 1979 revised estimates of competitive-bid costs.

## IMPROPER AWARD OF WRIT OF MANDAMUS

The District contends the trial court erred in directing the grant of a writ of mandamus on terms specified in the judgment. The judgment directs several different matters in that regard. First, the judgment awards Coulson a writ of mandamus to compel the District to pay the judgment out of available funds, specifically providing that the writ shall be one:

> COMMANDING AND COMPELLING the District and its board of directors to FORTHWITH and without further delay pay the judgment debt represented by this judgment out of any and all *lawfully available* funds of the District. Such funds *include* but are not limited to, the District's Maintenance and Operations Fund and its Construction Fund. Such funds expressly *exclude* the District's

Tax Account and bond fund *to the extent of needed and used or to be used* funds to pay principal and interest upon the District's outstanding bonds.

(emphasis added). Second, the judgment provides that the writ of mandamus shall order the statutory remedies of taxation or special assessment:

> *If no lawfully available funds exist,* the District and the members of its board of directors are *by this very judgment* further COMMANDED AND COMPELLED to FORTHWITH and without further delay levy, assess and collect taxes *or* assessments sufficient in amount to pay the judgment debt represented hereby.

(emphasis added). And finally, the judgment provides:

> The Defendant and the members of its board of directors are further COMMANDED AND COMPELLED to take *any and all necessary lawful action* in connection with the foregoing to see to the payment of this judgment. The Clerk is ordered to issue this Court's writ of mandamus *in the terms of this judgment* at any time after thirty (30) days after this judgment becomes final.

(emphasis added).

We conclude the trial court erroneously directed issuance of the writ of mandamus on these terms because the actions to be commanded in the writ were premature and legally impermissible.

*The Terms of the Writ are Legally Impermissible*

The Water Code provides that "[a]ny court in the state rendering judgment for debt against a district may order the board to levy, assess, and collect taxes or assessments to pay the judgment." Tex.Water Code Ann. § 54.121 (1972). This statute indisputably gives the trial court *the power* to order the District to take the steps necessary to obtain funds to pay a judgment, either through taxation or special assessment. The judgment in the present case does not, however, direct the issuance of a writ of mandamus in the terms authorized by § 54.121.

The first part of the judgment that refers to the writ of mandamus does not even address taxation or assessments; rather, it requires a writ compelling the District simply *to pay* the judgment "without delay" from "lawfully available funds," expressly including and excluding specified funds. This particular order is blatantly *not* an order authorized by § 54.121 because that statute authorizes the court to require payment of the judgment from funds that are *not* "available" at the time the writ is served—that is, funds the District must raise through the lengthy process of levy, assessment, and collection of taxes or special assessments.

Another passage in the judgment *does* specify that the writ of mandamus shall compel actions that fall within the authorizing terms of § 54.121. Insofar as the writ would order the board to levy, assess, and collect taxes or assessments sufficient to pay the judgment, the writ might be authorized by § 54.121; however, this action by the Board and the District is expressly made *contingent* on a future uncertainty: *whether* "lawfully available funds exist." Section 54.121 does *not* authorize this contingent command nor does it prescribe the mechanism or the accounting and legal standards for determining finally and authoritatively whether the prerequisite exists—that is, the District's possession of "lawfully available funds"—so that the Board and District may lawfully be punished for contempt in failing to obey the command.

 Mandamus is not available to control actions involving the exercise of discretion or judgment. *Womack v. Berry,* 156 Tex. 44, 291 S.W.2d 677 (1956); *City of Shoreacres v. State,* 582 S.W.2d 211 (Tex. Civ.App.1979, writ ref'd n.r.e.). In this instance, the writ would purport to control the discretion of the directors by ordering that the judgment be paid *immediately* out of "lawfully available funds," apparently precluding payment from newly obtained funds to pay the judgment. *See, e.g.,* Tex. Water Code Ann. § 54.302 (authority to borrow money); § 54.214 (proceeds from the sale of surplus land); § 54.232 (proceeds from gifts or grants). The Legislature did not, in § 54.121, purport to autho-

rize a court to control in this manner the director's lawful discretion. We conclude, therefore, that the form of the writ prescribed in the judgment—ordering immediate payment out of "lawfully available funds" and a contingent remedy of taxation and assessments to pay the deficiency—is not authorized by § 54.121 or the common-law rule pertaining to the issuance of such writs.

*Directing Issuance of the Writ 30 Days After Final Judgment is Premature*

 In addition to the illegality of the terms of the writ prescribed by the judgment, the issuance of the mandamus 30 days after final judgment would be premature for several reasons. First, issuance of a writ of mandamus requires a *previous evidentiary showing* and *judicial determination* of two prerequisites: (1) a legal duty to perform a non-discretionary act; and (2) a demand and refusal to perform that non-discretionary act. *See, e.g., Stoner v. Massey,* 586 S.W.2d 843, 846 (Tex.1979); *Industrial Accident Board v. Glenn,* 144 Tex. 378, 190 S.W.2d 805 (1945). The Engineer did not and could not possibly *prove before judgment* that payment of the *judgment* debt had been "demanded" and "refused."

This controversy involved bona-fide disputed issues of fact and law concerning the performance of the contract and the amount owing the Engineer, *which was unliquidated.* One must distinguish the *judgment* debt from the *antecedent claim of debt* made by the Engineer. Any *right* of action held by the Engineer, and any *claim* he had on or for breach of the contract, was merged in the judgment, which became a *new* obligation with new terms. *Kulow v. Farmers Royalty Holding Co.,* 144 Tex. 312, 190 S.W.2d 60 (1945). Issuance of the writ of mandamus depended on the award for *this* new sum and a subsequent refusal to pay *it.*

 In certain limited circumstances, proof of demand and refusal are not necessary. For example, the winning litigant need not make such a showing when the officer clearly "neglected or refused" to perform his ministerial duty. *See, e.g., Hawthorne v. La–Man Constructors, Inc.,* 672 S.W.2d 255 (Tex.App.1984, no writ) (City Housing Authority had clearly "neglected or refused" a demand when evidence showed that attempts to satisfy or partially satisfy the judgment had been unsuccessful for more than a year after an appeals court had affirmed the original judgment). Similarly, courts may dispense with the demand-and-refusal requirement when the conduct of the losing litigant demonstrates that such a demand would be futile. *See, e.g., City of Austin v. Cahill,* 99 Tex. 172, 88 S.W. 542, 545 (1905) (no formal demand for the relief sought by the petition for mandamus before suit was brought, but proof showed that the city's attorney, mayor and finance committee had on several occasions informed the petitioner's attorney that the city *would not* pay the obligation). Neither of these exceptions was shown to be applicable in the present case by evidence or by trial-court determination.

The Engineer, in his brief, attempts to persuade us that courts have traditionally recognized as legitimate the combining of a judgment for debt with issuance of a writ of mandamus. The Engineer refers to *City of Houston v. Emery,* 76 Tex. 282, 13 S.W. 264 (1890) as support for this proposition. We do not find therein any language suggesting such a rule. Instead, that decision approves a simultaneous proceeding: (1) for the purpose of reviving a former judgment; and (2) for enforcement *of the revived* judgment (the "new debt") by writ of mandamus. *Id.* 13 S.W. at 266. Any reference in the opinion to "an action of debt" refers to the revival of the *judgment* debt as a new debt and does not mean, as appellant contends, an original action on a *claim* of debt that was never reduced to a judgment.

The Engineer also cites *Travis–Williamson Water Control District v. State,* 359 S.W.2d 528 (Tex.Civ.App.1962, writ ref'd n.r.e.) where the opinion contains a statement that the trial court was correct in issuing a writ of mandamus commanding officials of a water district to satisfy the

state's money judgment. *Id.* at 533. The appellants in *Travis–Williamson Water Control District* did not, however, challenge the timeliness or issuance of the writ of mandamus. Therefore, this particular issue was not before the Court and we will not give any precedential value to the unsupported dictum in question. In any case, the dictum is contrary to the basic rules governing the issuance of writs of mandamus.

Finally, the Engineer argues that the condition stated in the trial-court order—allowing the District thirty days after the judgment became final before issuance of the writ of mandamus—is sufficient to satisfy the demand-and-refusal requirements. We disagree with this contention because the requisites of a writ of mandamus require *proof* of demand and refusal. A simple delay of 30 days in satisfying the judgment is not proof of either. A writ will not issue merely because of delay in taking official action unless the court may conclude *as a matter of law* that the delay has been *unreasonable*—a matter of allegation and proof in the ordinary case. *Cathey & Carrell v. Terrell,* 121 Tex. 130, 45 S.W.2d 956 (1932).

Moreover, a writ of mandamus would be premature in the present case because an *alternative remedy* was not precluded as a matter of law or as a matter of fact determined by the trial court. *See State ex rel. Pettit v. Thurmond,* 516 S.W.2d 119 (Tex. 1974); *Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709 (1945). In this case, the trial-court judgment purports to justify issuance of the writ of mandamus on the ground that the District is a "public entity not subject to writs of execution or garnishment...." This apparent basis for the writ is legally incorrect because the traditional legal remedies of garnishment, attachment, and execution may be available to the Engineer.

While Tex. Const.Ann. art. XI, § 9 (1955) forbids levy of a writ of execution on a municipal corporation's property *held for public purposes,* that provision does not imply that *all* property owned by the District is exempt from levy. *See, e.g., Grand*

*Prairie Hosp. v. Tarrant Appraisal District,* 707 S.W.2d 281 (Tex.App.1986, writ ref'd n.r.e.) (medical office building, part of which was leased to doctors in private practice, was not used for "public purposes" as a matter of law). The record shows no basis for the trial court's presuming as a matter of law that *all* the District's property was exempt from execution, attachment, or garnishment so that it was unnecessary for the Engineer to show that a writ of execution had been issued and returned *nulla bona,* as in the ordinary case.

And finally, that part of the mandamus that would order the District to collect funds through taxation or special assessment is premature because the duty commanded is expressly made contingent on funds not being lawfully available. The duty is manifestly not a *present* duty; it will not *arise* until someone (presumably the District) has determined that "lawfully available" funds are insufficient to pay the judgment. In other words, the directors cannot know what their duty is (whether to pay out of "lawfully available funds" or commence the lengthy steps necessary for taxation or special assessment) until someone has authoritatively *determined* the state of the District's accounts and whatever issues of fact and law are implicit in the vague term *"legally* available." A writ of mandamus will not issue before the time for performance has arrived. *See Austin v. Cahill,* 88 S.W. at 542; *Jones v. Dodd,* 192 S.W. 1134 (Tex.Civ.App.1917, no writ); *Moody v. Jones,* 519 S.W.2d 536 (Tex.Civ. App.1975, no writ).

For all of the reasons discussed above, we hold the writ of mandamus was erroneously awarded in the judgment below.

### IMPROPER AWARD OF CREATION FEE

The contract lists twelve professional engineering and associated services performable by the Engineer in connection with the creation of the District. Concerning the Engineer's compensation for these services, the contract provides:

For the foregoing services pertaining to the creation of the District, the Consult-

ing Engineer shall receive 1% of the total authorized bond issue voted by the District for the financing of the Projects. Payments of this portion shall be payable out of the first issuances of bonds or from any other legal source.

The contract provides, in effect, that the Engineer will receive compensation *only* if the bond issue is officially *approved.* This provision for a contingent-fee arrangement is not enforceable in the courts of this State to the extent it remains executory.

Two bond elections were held (the 1971 election authorized $12 million in bonds and the 1973 election authorized $7.5 million in bonds). Before the present suit was filed, the District had paid the Engineer $146,750 in creation-and-organization fees. At trial, the court concluded the fee was limited to $120,000 (1% of the original bond authorization of $12 million) and awarded the District an offset of $26,750 for overpayment of the creation fee.

Both parties contend the $26,750 offset was erroneous. The District argues, *inter alia,* that the fee provision is void and the court should offset the entire $146,750. The Engineer, on the other hand, argues that he is entitled to 1% of both bond issues; that no overpayment was made (thus any offset was erroneous); and that he is entitled to an additional $75,000 in creation-and-organization fees. We shall first consider the District's contentions.

One of the District's objections to the validity of the creation-and-organization fee provision is that a contingent-fee arrangement for engineering services is void because it is contrary to public policy. The Water Code plainly gives the District the authority to "pay all the costs and expenses necessarily incurred in the creation and organization of a district." Tex. Water Code Ann. § 54.305 (1972). The District contends that the contractual provision in this case falls outside the scope of § 54.305 because a contingent-fee arrangement is contrary to public policy and unenforceable under the express terms of the Professional Services Procurement Act, Tex.Rev.Civ. Stat.Ann. art. 664–4 (Supp.1987).

The District's argument that the fee provision is void may be succinctly stated as follows: first, fees charged in a contract between a registered engineer and any political subdivision must be *"consistent with* and *not higher than* the published recommended practices and fees of the various applicable professional associations."* Tex.Rev.Civ.Stat.Ann. art. 664–4, § 3 (Supp.1988) (emphasis added). Second, any contract in violation of art. 664–4 is *"void as contrary to the public policy* of this State" and *"shall not be given effect or enforced by any Court* of this State," *id.* at § 4 (emphasis added). And third, the Manual of Professional Practice General Engineering Service (which was attached to the contract and was the recognized statement of the "recommended practices" of professional engineers at the time) provides:

[I]t is not in the public interest, and therefore unethical, for an engineer to accept employment on a contingency basis.... The danger inherent in such a practice, which requires a favorable recommendation of a project by an engineer as a condition of his compensation, is self-evident.

The language of § 664–4 contains two related but distinctly different requirements for a professional-fee contract: (1) the fees must be "consistent with" the recommended published practices of the professional associations; and (2) the fees must be "not higher than" the recommended published practices of the professional associations. *Id.* at § 3. The statute clearly directs that a violation of *either* requirement results in the voidness and *mandatory* unenforceability of the fee provision. *Id.* at § 4. We conclude the Engineer's contract violated the first such requirement.

A contingent-fee arrangement is generally condemned by the Code of Ethics because the engineer who does his work with painstaking care to produce a design that can be built with minimum cost automatically receives less compensation for his greater exercise of skill than he would for a hastily designed, and perhaps more costly, project. Dunham & Young, Contracts,

Specifications, and Law for Engineers 128 (1958). Furthermore, in a case like the one before us, the Engineer's receipt of compensation is conditioned upon a favorable recommendation by him to the Texas Water Commission and the electorate. Such an arrangement places the Engineer in a position of potential conflict of interest—a position where any unfavorable official view of the plans means the Engineer will receive no compensation. Whether the Engineer actually acted unethically in recommending the adoption of his plans is irrelevant. If the tendency of the contract is vicious, the innocent intentions of the parties cannot save it. *Aycock v. Braun*, 66 Tex. 201, 18 S.W. 500 (1886).

We agree the fee arrangement is inconsistent with applicable professional standards for the following reasons. First, the manual specifically condemns a contingent-fee arrangement in a contract for professional engineering services. Second, that part of the manual dealing with fees was incorporated into the very contract sued upon. And third, the statute establishes a public policy against this type of fee arrangement. Consequently, the contract provision is void and the trial court should not have enforced the provision. Tex.Rev. Civ.Stat.Ann. art. 664–4, *supra.* The District was therefore entitled to an offset of the entire $146,750. We hold accordingly.

■ While the Engineer failed to plead for recovery in *quantum meruit,* we note he is not precluded from recovery on that basis because a municipality receiving benefits under a contract that fails to conform with a statute remains liable for the reasonable value of the benefits received. *See, e.g., Waller County v. Freelove,* 210 S.W.2d 602 (Tex.Civ.App.1948, writ ref'd n.r.e.) (recovery in *quantum meruit* allowed for architectural services rendered under contract that was void because it violated constitutional provision that payment of all debts must be provided for at the time debt was created).

Because we have determined that the creation-and-organization fee provision of the contract is void, we overrule the Engineer's cross-point that he was entitled to a greater recovery on the basis of this provision.

*Prejudgment Interest*

■ The District attacks the trial-court judgment insofar as it awards prejudgment interest, from September 23, 1979 until the date of trial, on those projects for which no evidence was adduced that the bonds had been approved by the Texas Water Commission.[8] We hold the award of such prejudgment interest was unjustified because the 1973 amendment to the contract specifically provided:

> All fees owed to 'Consulting Engineer' will become due and payable at the end of five (5) years from the date bonds are approved by the Texas Water Rights Commission if said bonds or a portion thereof remain unsold.

The Engineer does not attack this agreement. Under these circumstances, the fee for these projects ($136,703) was not payable until, at the earliest, some time in 1984. The trial court erred in awarding prejudgment interest because the sum was not yet "due and payable" at the time of trial. Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (1987).

For the reasons set forth above, we reverse the judgment below and remand the causes for a new trial.

---

8. No evidence was adduced to show that bond approval was received, before the Engineer's termination, for the 1.3 million-gallon elevated tank, the microfloc water treatment plan, or the wastewater effluent line.