Paul Clarke v. Alfred Lehtonen
















IN THE
TENTH COURT OF APPEALS
 

No. 10-96-253-CV

     PAUL CLARKE,
                                                                              Appellant
     v.

     ALFRED LEHTONEN,
                                                                              Appellee
 

From the 361st District Court
Brazos County, Texas
Trial Court # 31,301-361
                                                                                                                

O P I N I O N
                                                                                                                

      Appellant Paul Clarke brought suit against Appellee Alfred Lehtonen for dissolution and
accounting of an alleged joint venture founded on an unwritten agreement. Clarke also asserted
claims of breach of the alleged joint venture agreement, breach of fiduciary duty, breach of
contract, promissory estoppel, and quantum meruit. The parties tried the matter before the court,
which originally rendered judgment in favor of Clarke. The court subsequently set that judgment
aside and rendered judgment that Clarke take nothing.
      Clarke presents sixteen points of error for our consideration in this appeal. One point
challenges the propriety of the trial court’s decision to set aside its original judgment and render
a take-nothing judgment. A second questions the adequacy of the court’s findings of fact and
conclusions of law. Two points address the question of whether Clarke and Lehtonen had agreed
to form a joint venture. Twelve of the points concern the application of the Real Estate License
Act (“RELA”) to the parties’ agreement. Lehtonen has responded to Clarke’s points and presents
one cross-point in which he argues that the parties’ agreement is too vague and indefinite to be
enforceable. We will affirm the judgment.
I. FACTUAL BACKGROUND
      Clarke became a licensed real estate broker in 1986 and worked with Brazosland Properties
as an agent and broker. Clarke and Lehtonen first became associated that same year when Clarke
brokered Lehtonen’s purchase of two office buildings in College Station which had been foreclosed
by a savings and loan association. Lehtonen signed a management agreement with Brazosland for
these properties effective January 1, 1987. Clarke signed this agreement on behalf of Brazosland
and managed the properties for Brazosland. Lehtonen advised Clarke that he would be interested
in other real estate investments and asked Clarke to keep him advised of other investment
opportunities.
      In April 1987, Rostell Chapman, another broker with Brazosland, contacted Lehtonen to
discuss a potential investment opportunity with Emanuel Glockzin, Jr. These three met on April
12 to discuss the purchase of the Barcelona Apartments in College Station which Metropolitan Life
Insurance Company owned pursuant to foreclosure. Glockzin proposed that Lehtonen join him
in a joint venture to purchase and renovate the apartments for leasing in September in conjunction
with the beginning of the fall semester at Texas A&M University. Glockzin required Lehtonen
to sign a handwritten agreement in which Lehtonen agreed that he would not “attempt to
circumvent Glockzin or attempt to negotiate with [Met Life] directly prior to a contract for sale
submittal.”
      One or two days after this meeting, Chapman advised Clarke of the proposed venture. 
Glockzin, Lehtonen, Chapman, and Clarke met frequently in the following weeks as they sought
to bring about the proposed venture.


 The Glockzin-Lehtonen venture never materialized,
however. According to Lehtonen, Glockzin did not provide his financial share in the deal. 
Glockzin claims that the parties originally agreed that Lehtonen would provide all financing and
that Glockzin would supervise the renovation of the property and manage the refurbished complex.
      After Glockzin and Lehtonen reached their impasse, Lehtonen determined to pursue the
development himself and asked Clarke to assist him. Pursuant to Lehtonen’s request for
assistance, Clarke obtained information from Met Life about the company’s requirements for the
sale. He prepared pro forma documents for potential lenders which forecast the timetable and
costs of renovation and which projected future revenues for the renovated apartments. He
arranged for the required appraisal of the property.
      According to Clarke, Lehtonen offered him five percent of the net revenues from the project
if Clarke would oversee the renovation and leasing of the apartments. Clarke interpreted this to
mean that Lehtonen was offering “a five percent partnership interest” in the project in exchange
for his “sweat equity.” Lehtonen testified that he offered to pay Clarke’s costs during the
renovation project and then pay five percent of gross rentals for management of the renovated
complex. Lehtonen denied that he ever offered Clarke any interest in a partnership or joint
venture.



      Lehtonen ultimately secured financing without Glockzin’s assistance and closed on the
property. Met Life sold the complex to Lehtonen and his wife on June 10. At the closing,
Lehtonen and his wife also executed a note and deed of trust in connection with their purchase.
      Clarke assisted Lehtonen in the renovation of the apartment complex. He coined the name
they would give the renovated apartments: The Polo Club Apartments. He used his local business
contacts to recruit general contractors and sub-contractors for the project and assisted Lehtonen
in selecting contractors.


 Clarke opened checking accounts for the apartments and used his own
credit with local vendors to obtain many of the supplies used by the contractors. He provided
monthly financial reports on the status of the renovation effort and on leasing activities. Clarke
and Lehtonen regularly discussed the progress of the project and walked the property reviewing
the work.
      For reasons disputed, Clarke left the project in September 1987. The contractors completed
the renovations in a timely fashion, and the Polo Club began showing profitable revenues soon
after. Clarke brought suit against Lehtonen in June of the next year.
      The parties tried the case before the court in January and February 1996. Two weeks after
the conclusion of the trial, the court informed the parties in a letter that it would render judgment
for Clarke. The court signed its judgment on June 11. The judgment awarded Clarke $168,000
for breach of an oral contract and awarded attorney’s fees to Clarke. On July 9, Lehtonen filed
a “Motion to Correct, Modify or Reform Judgment or Alternatively Motion for New Trial.” The
court signed an “Order Setting Aside Prior Judgment and Entering Final Judgment” on August
23. In this decree, the court ordered that Clarke take nothing by his suit.
II. SETTING-ASIDE OF PRIOR JUDGMENT
      Clarke claims in his first point that the court abused its discretion by setting aside its original
judgment and the findings of fact and conclusions of law made in support of that judgment. Clarke
specifically argues that the court abused its discretion by changing the original findings and
making new findings because our procedural rules do not “condone the wholesale substitution of
findings of fact and conclusions of law on the same record.”
A. The Pertinent Facts
      The court signed the original judgment on June 11. Pursuant to Lehtonen’s request, the court
filed written findings of fact and conclusions of law supporting the June 11 judgment. In pertinent
part,


 the court found that Clarke and Lehtonen had an oral agreement whereby Clarke would
provide services to Lehtonen “incident to the renovation, rehabilitation, leasing and interim
management of the [apartments] in return for five percent of net profits which would be realized
from [the project].” The court found that Lehtonen breached the agreement by refusing to pay
Clarke his share of the net profits, which share amounted to $168,000 for the period from 1987
through 1995. The court also found that Clarke’s suit does not seek recovery of a commission for
the sale or purchase of real property.
      In its original conclusions of law, the court determined in pertinent part that Clarke and
Lehtonen had a valid and enforceable contract and that Lehtonen owed Clarke $168,000 on the
basis of that contract. The court also concluded that the RELA statute of frauds did not apply to
the parties’ contract and that the contract was not barred by any other applicable statute of frauds.
      One week after the court signed these findings and conclusions, Lehtonen filed a motion for
the court to modify, correct or reform the judgment or to grant a new trial. Lehtonen asserted in
this motion that the parties’ agreement was too uncertain and indefinite to be enforced and reurged
his trial position that the agreement is barred by the RELA statute of frauds. He asked the court
to either “modify” its judgment by decreeing that Clarke take nothing or set aside the judgment
and grant a new trial.
      On August 23, the court signed an order setting aside the June 11 judgment “and the findings
of fact and conclusions of law associated with it” and rendering judgment that Clarke take nothing
from Lehtonen. At Clarke’s request, the court made findings of fact and conclusions of law on
September 5 to support the August 23 judgment. The findings and conclusions are as follows:
FINDINGS OF FACT
      (1)  The parties entered into an oral contract whereby Clarke was to provide services
to Lehtonen.
 
      (2)  The services that were to be provided by Clarke to Lehtonen under the oral
contract included, among other things, the sale or purchase of real estate.
 
      (3)  Clarke’s compensation under the oral contract was to be five per cent (5%) of
the net profit to Lehtonen.
 
      (4)  At the time of all his dealings with Lehtonen, Clarke was a licensed real estate
agent or real estate broker subject to the Texas Real Estate Licensing Act.

CONCLUSIONS OF LAW
 
      (1)  The oral contract to compensate Clarke from the net profit to Lehtonen was
calculated as a percentage on the amount of the profit to Lehtonen and thereby
was a commission.
 
      (2)  The oral contract for services by Clarke included other services in addition to
services for the sale or purchase of real estate but the oral contract was
indivisible and inseparable.
 
      (3)  Clarke is not entitled to any recovery because his suit for compensation is a suit
for a commission based on an indivisible oral contract involving in part the sale
or purchase of real estate.
 
      (4)  The Texas Real Estate Licensing Act §20(b) bars Clarke from filing this suit in
the courts of this state to recover a commission for the sale or purchase of real
estate because the promise or agreement on which this action was brought, or
some memorandum thereof, was not in writing and signed by the person to be
charged.

B. The Applicable Law
      “A trial court has plenary power over its judgment until it becomes final.” Fruehauf Corp.
v. Carrillo, 848 S.W.2d 83, 84 (Tex. 1993) (citing Transamerican Leasing Co. v. Three Bears,
Inc., 567 S.W.2d 799, 800 (Tex. 1978)). During the pendency of the court’s plenary authority,
the court may vacate, modify, correct, or reform the judgment, or grant a new trial. 
Transamerican Leasing, 567 S.W.2d at 800; Tex. R. Civ. P. 329b(e). Because this appeal
concerns the authority of a trial court to vacate its judgment, we focus on that specific aspect of
the court’s plenary power.
      Once a judgment has been vacated, it is superceded. Ferguson v. Naylor, 860 S.W.2d 123,
127 (Tex. App.—Amarillo 1993, writ denied). When a previously rendered judgment is set aside
or vacated, “the matter stands precisely as if there had been no judgment.” Id. If another
judgment is substituted for the one vacated, the subsequent judgment becomes the judgment of the
court. See id. at 127-28; see also, e.g., Board of Trustees v. Toungate, 958 S.W.2d 365, 367
(Tex. 1997) (trial court originally rendered judgment that plaintiff take nothing but then rendered
judgment in plaintiff’s favor during pendency of motion to modify judgment); Transamerican
Leasing, 567 S.W.2d at 800 (judgment vacated while motion for new trial pending); Imperial Ins.
Co. v. Ellington, 498 S.W.2d 368, 370 (Tex. Civ. App.—San Antonio 1973, no writ) (trial court
originally rendered judgment on jury verdict but then set aside judgment and rendered JNOV
during pendency of motion for new trial).
      Clarke argues that a trial court abuses its discretion when modifying a judgment if the court
changes findings of fact made at the time of the original judgment. He cites two cases in support
of this proposition. Bryan v. Resolution Trust Corp., 823 S.W.2d 433, 434 (Tex. App.—Houston
[1st Dist.] 1992, writ dism’d w.o.j.); First Nat’l Bank v. Walker, 544 S.W.2d 778, 782 (Tex. Civ.
App.—Dallas 1976, no writ). Clarke’s reliance on these authorities is misplaced.
      In Walker, the trial court rendered judgment in accordance with a jury verdict. Thereafter,
Walker brought certain erroneous recitals in the judgment to the court’s attention. Less than a
week after signing the original judgment, the court signed an order setting aside the judgment due
to the erroneous recitals. On the same day, the court signed a new judgment in substantially the
same form as the original judgment but with three minor modifications. First National argued
before the appellate court that the trial court’s order setting aside the former judgment “meant that
a new trial was granted automatically.” Walker, 544 S.W.2d at 781.
      Citing rule 329b and a number of cases addressing the plenary power of a trial court, the
Dallas court concluded “that a trial court is not prohibited from correcting its judgment so long
as it does not attempt to make new findings of fact or usurp the authority of the jury.” Id. at 782. 
The court rejected First National’s argument, holding that because the court merely modified its
original judgment and did not “change the fact findings made at the time of the first judgment”
the modified judgment was valid. Id.
      Walker is distinguishable for two reasons: (1) it was an appeal from a jury trial; and (2) it did
not address the authority of a court to render judgment notwithstanding the jury’s verdict. See,
e.g., P.V. Int’l Corp. v. Turner, Mason, & Solomon, 700 S.W.2d 21, 22-23 (Tex. App.—Dallas
1985, no writ).



      In Bryan, the trial court rendered judgment in accordance with the parties’ settlement
agreement. Neither the settlement agreement nor the judgment addressed Bryan’s counterclaims
against RTC. On RTC’s motion, the court thereafter signed a modified judgment decreeing that
Bryan take nothing by his counterclaims.
      The First Court of Appeals concluded that the trial court did not abuse its discretion in
modifying the judgment because the modification served as “a mere clarification” of the court’s
original judgment. Bryan, 823 S.W.2d at 435. The court cited Walker for the proposition that 
“[a] trial court does not abuse its discretion in modifying a judgment so long as it does not review
or change the fact finding made at the time of its first judgment.” Id. at 434.
      In a dissenting opinion, Justice Dunn explained why Walker did not apply in that case:
The Walker holding is not applicable in this case. In Walker, a trial on the merits was
held and the jury made fact findings. Because this was an agreed judgment, the trial
court did not make any fact findings. There was not a trial on the merits; and therefore,
no facts to find.

Id. at 435 (Dunn, J., dissenting) (citation omitted). Walker (and Bryan) do not apply to the
present case because the trial court did not change any jury findings when it set aside its former
judgment and rendered a new judgment.
      Clarke next cites the principle that a court’s findings of fact “have the same force and dignity
as a jury’s verdict.” Tucker v. Tucker, 908 S.W.2d 530, 532 (Tex. App.—San Antonio 1995, writ
denied). On this basis, Clarke argues that the trial court cannot subsequently change its original
fact findings under the rule announced in Walker. We have already distinguished Walker as
applying only to jury trials.
      Because findings of fact after a bench trial have the same dignity as a jury’s findings, a
compelling argument can be made that, once the judge has made findings of fact, he or she should
not be free to change those findings but should grant a new trial if the findings are not supported
by the evidence. However, because findings only occur in a bench trial in which the judge heard
the evidence, a more compelling argument is that judicial economy will be served by a rule that
allows a judge to correct a finding of fact which he or she later determines to be erroneous,
without necessitating another trial. Unlike a jury which has been discharged and is no longer
available, the judge remains with the case after serving as the factfinder. A party who believes
that a later finding is not supported by the evidence is free to attack the later findings on legal and
factual sufficiency grounds. Thus, we see no reason to unnecessarily restrict the judge’s ability
to modify, correct, or withdraw findings of fact after they are made.
C. Application of the Law to the Facts
      The court signed its original judgment on June 11. Within thirty days after judgment,
Lehtonen filed a motion asking the court to modify, correct or reform the judgment or 
alternatively to grant a new trial. Lehtonen’s motion operated to extend the court’s plenary power
until such time as the court expressly overruled the motion or the motion was overruled by
operation of law (seventy-five days after judgment). Tex. R. Civ. P.329b(c), (e), (g).
      The court vacated its original judgment on August 23, seventy-three days after the original
judgment and while still within the court’s plenary power. See Toungate, 958 S.W.2d at 367;
Transamerican Leasing, 567 S.W.2d at 800. Accordingly, we overrule Clarke’s first point.

III. ADEQUACY OF THE COURT’S FINDINGS
OF FACT AND CONCLUSIONS OF LAW

      Clarke contends in his second point that the court erred by not making additional findings of
fact and conclusions of law pursuant to his request. Clarke claims that the court’s failure to make
such findings has prejudiced his ability to present the issues of partnership and the RELA statute
of frauds because the court’s findings do not directly or indirectly dispose of these issues. 
Lehtonen responds that the court’s findings sufficiently address the RELA issue and that Clarke
failed to properly preserve his claim regarding partnership because he did not request an additional
finding on the “ultimate issue [of] whether the parties’ agreements were sufficient to constitute a
partnership.” We first address Lehtonen’s waiver argument.
A. Preservation of Error
      Upon a party’s request, a trial court must make additional findings if the requested findings
relate to an ultimate issue. Levine v. Maverick County Water Control & Improvement Dist. No
1, 884 S.W.2d 790, 796 (Tex. App.—San Antonio 1994, writ denied); Dura-Stilts Co. v. Zachry,
697 S.W.2d 658, 661 (Tex. App.—Houston [1st Dist.] 1985, writ ref’d n.r.e.). In order to
properly preserve a complaint that the trial court failed to make required additional findings, a
party must have timely requested the additional findings and must have objected or excepted to the
court’s refusal to grant the requested findings. See Levine, 884 S.W.2d at 796; Tex. R. App. P.
52(a), 49 Tex. B.J. 573 (Tex. 1986, repealed 1997).


 If the opposing party does not dispute the
allegation that the trial court failed to make the requested findings, then error is preserved
regardless of whether the party seeking the findings objected to the court’s refusal. Levine, 884
S.W.2d at 796 (citing Cherne Indus., Inc. v. Magallanes, 763 S.W.2d 768, 772 (Tex. 1989)).
      Clarke timely requested findings of fact on each element of the partnership which he alleges
the parties formed. The issue of whether the parties had formed a partnership was an ultimate
issue in the case. The trial court failed to act on Clarke’s request for additional findings, and
Lehtonen does not dispute that the court failed to grant the additional findings. Accordingly,
Clarke has properly preserved any error arising from the court’s failure to make additional
findings relating to the parties’ alleged partnership. Id.
B. The Law Applicable to the Trial Court’s
Failure to Make Additional Findings

      The trial court has a mandatory duty to file findings of fact and conclusions of law if they are
properly requested. Cherne Indus., Inc. v. Magallanes, 763 S.W.2d at 772; Zieba v. Martin, 928
S.W.2d 782, 786 (Tex. App.—Houston [14th Dist.] 1996, no writ). If the trial court fails to
respond, harmful error is presumed, “unless ‘the record before [the] appellate court affirmatively
shows that the complaining party has suffered no injury.’” Cherne Indus., 763 S.W.2d at 772
(quoting Wagner v. Riske, 142 Tex. 337, 343, 178 S.W.2d 117, 120 (1944)). Conversely,
“[e]rror is harmful if it prevents an appellant from properly presenting a case to the appellate
court.” Tenery v. Tenery, 932 S.W.2d 29, 30 (Tex. 1996).
C. Application of the Law to the Facts
      Under the record before us, we conclude that Clarke has not been harmed by the court’s
failure to make the additional findings. See Tenery, 932 S.W.2d at 30; Cherne, 763 S.W.2d at
772. Clarke has effectively presented his appeal to this Court. See Tenery, 932 S.W.2d at 30. 
Accordingly, we overrule his second point.
IV. PARTNERSHIP (OR JOINT VENTURE)
      Clarke contends in his eighth point that the court’s failure to find a partnership agreement is
so contrary to the overwhelming weight of the evidence as to be manifestly unjust. He urges in
his ninth point that the court’s finding that the parties had an agreement to share profits raised a
presumption of partnership which Lehtonen failed to rebut.
A. The Pertinent Facts
      Clarke testified that Lehtonen asked Clarke on May 12 “to continue on” with him in the
project to acquire, renovate and lease the apartments. According to Clarke, Lehtonen wanted him
to continue in a joint venture between themselves without their former joint venturers, Chapman
and Glockzin. In exchange, Clarke would receive five percent of the net profits from the
apartments and five percent of the proceeds if the project were sold or refinanced.
      Clarke testified that Lehtonen sometimes referred to him as a “partner” in the presence of
others. Two witnesses specifically corroborated this. One stated that she recalled Clarke and
Lehtonen referring to each other as partners on four or five occasions. The other recalled that
Lehtonen described their relationship as “a joint venture.” Two testified that Clarke introduced
Lehtonen to them as his “partner.” In a letter to the appraiser, Clarke referred to Lehtonen as the
“principal” and “lead partner” in the project to develop the apartments. He sent a copy of this
letter to Lehtonen.
      Clarke equivocated somewhat when discussing whether the parties had an agreement to share
any losses from the project. In essence, he testified that the parties never really projected any
losses from their project. The following is a portion of Clarke’s testimony on this issue:
      Counsel:      From the standpoint of losses up until the date of closing, had you-all even
discussed the possibility that you would have losses sustained in your
partnership?
 
      Clarke:        No, sir. Our pro formas reflected that we would never sustain losses.

      He explained that the agreement was that his share of losses from any operating period would
be carried over and accounted for in a later period when the project was again realizing profits:
      Counsel:      Okay. And if there were losses in any particular year, would that be accounted
for in later years with regard to any profits that might be made?
 
      Clarke:        That’s correct.

      Clarke stated that Lehtonen and he did not have an agreement that he would not share in
losses from the apartments. Clarke ended his rebuttal testimony with the following description
of his agreement with Lehtonen concerning losses from the project:
      Clarke: That—our discussions along losses dealt with we were looking at the performance. 
We had no projected negative cash flows starting once school started. Again, there
were soft costs borrowed from the bank to offset anything during the summer. That
was the philosophy of the program. When we did discuss it, we made a decision that
debt services would be treated just like a normal operating expense before my five
percent profit participation in the venture would be paid out.

      Other evidence adduced at trial tended to show that the parties did not have a joint venture. 
Lehtonen unequivocally denied that he had ever offered Clarke an interest in a partnership or joint
venture and did not recall ever referring to the project as a joint venture between Clarke and
himself. Rather, he testified that he offered Clarke a management contract. A roofing
subcontractor testified that Lehtonen told him Clarke was not a partner in the project. A bank
officer stated that Clarke claimed that his only involvement in the project was “in management.” 
A leasing agent stated that she understood Clarke to be “the broker in the purchase.” The
manager of the Polo Club testified that Clarke was “basically [Lehtonen’s] manager” for the
renovation of the apartments. Clarke reported a theft of materials from the Polo Club on
September 10, 1987. He identified himself in the report as the manager of the Polo Club. 
Lehtonen testified that he had no agreement with Clarke to share any losses arising from the
operation of the Polo Club.
      Documentary evidence also tends to disprove Clarke’s claim. Mr. and Mrs. Lehtonen were
personally liable on the note by which they financed the purchase and renovation of the
apartments. Clarke did not sign the note. In his pleadings Clarke alleged that Lehtonen and he
had agreed that Clarke “would not be responsible for the indebtedness on the property.” When
questioned about this allegation Clarke explained, “[T]he partnership would be responsible for the
repayment of the loan, but not the loan is what this means.”
      Lehtonen executed an assumed name certificate in Clarke’s presence which designates the
ownership of the Polo Club as a sole proprietorship. The checking account signature cards for the
Polo Club designate ownership to be a sole proprietorship. Reports filed with the Texas
Employment Commission refer to the Polo Club as a sole proprietorship. The Polo Club
application for a federal tax identification number indicates individual ownership.
B. The Applicable Law
1. Partnership or Joint Venture?
      Clarke argues in his petition and his brief that the parties’ agreement created a partnership
under the Texas Uniform Partnership Act. See Tex. Rev. Civ. Stat. Ann. art. 6132b (Vernon
1970 & Supp. 1998). The witnesses and attorneys used the terms “partnership” and “joint
venture” interchangeably at trial to describe the agreement. Texas courts have discussed the
similarities and distinctions between partnerships and joint ventures for decades.
      In 1935 our Supreme Court stated that a joint venture “is constituted by a special combination
of persons in the nature of a partnership—more particularly, a limited or special
partnership—engaged in the joint prosecution of a particular transaction for mutual benefit or
profit.” Holcombe v. Lorino, 124 Tex. 446, 455, 79 S.W.2d 307, 310-11 (1935); accord Brown
v. Cole, 155 Tex. 624, 631, 291 S.W.2d 704, 709 (1956); Ben Fitzgerald Realty Co. v. Muller,
846 S.W.2d 110, 120 (Tex. App.—Tyler 1993, writ denied); Austin v. Truly, 721 S.W.2d 913,
923 (Tex. App.—Beaumont 1986), aff’d, 744 S.W.2d 934 (Tex. 1988); Woodrum v. Cowan, 468
S.W.2d 592, 599 (Tex. Civ. App.—Austin), rev’d on other grounds, 472 S.W.2d 749 (Tex.
1971). Joint ventures and partnerships “are so similar and closely kin” that they are governed “by
rules which are closely analogous to and substantially the same, if not exactly the same, as those
which govern partnerships.” Woodrum, 468 S.W.2d at 599 (quoting 46 Am. Jur. 2d Joint
Ventures § 4 (1938)); accord Thompson v. Duncan, 44 S.W.2d 904, 907 (Tex. Comm’n App.
1932, judgm’t adopted); Muller, 846 S.W.2d at 120; Austin, 721 S.W.2d at 923.
      Apparently Clarke urges that we examine whether his agreement with Lehtonen created a
partnership to take advantage of section 7(4) of the Texas Uniform Partnership Act which provides
in pertinent part that “[t]he receipt by a person of a share of the profits of a business is prima facie
evidence that he is a partner in the business.” Tex. Rev. Civ. Stat. Ann. art. 6132b, § 7(4)
(Vernon 19xx). However, the sharing of profits by itself does not establish a partnership. Id. art.
6132b, § 7(3); Adams v. Petrade Int’l, Inc., 754 S.W.2d 696, 713 (Tex. App.—Houston [1st
Dist.] 1988, writ denied); Gutierrez v. Yancey, 650 S.W.2d 169, 172 (Tex. App.—San Antonio
1983, no writ); Tex-Co Grain Co. v. Happy Wheat Growers, Inc., 542 S.W.2d 934, 937 (Tex.
Civ. App.—Amarillo 1976, no writ). Rather, it creates a fact issue for the finder of fact on the
question of the existence of a partnership. Tex-Co, 542 S.W.2d at 937; accord Adams, 754
S.W.2d at 713; Gutierrez, 650 S.W.2d at 172.
      Texas courts have historically applied the same principles when determining whether a joint
venture or a partnership has been formed. See Schlumberger Technology Corp. v. Swanson, 959
S.W.2d 171, 175-76 (Tex. 1997); Thompson, 44 S.W.2d at 907; Adams, 754 S.W.2d at 713;
Austin, 721 S.W.2d at 923. Thus, the label we attach to the parties’ alleged relationship makes
no significant difference in terms of our analysis. If the parties’ relationship is as Clarke alleges,
it is more accurately designated a joint venture because the alleged agreement is limited to a single
enterprise: the acquisition, renovation, and operation of the apartment complex. See Brown, 155
Tex. at 631, 291 S.W.2d at 709; Muller, 846 S.W.2d at 120.
      The elements for determining whether a joint venture exists are:
      (1)  a community of interest in the venture;
      (2)  an agreement to share profits;
      (3)  an agreement to share losses; and
      (4)  a mutual right of control or management of the enterprise.
Ayco Development Corp. v. G.E.T. Serv. Co., 616 S.W.2d 184, 186 (Tex. 1981); Smith v. L.D.
Burns Drilling Co., 852 S.W.2d 40, 41 (Tex. App.—Waco 1993, writ denied). The existence of
a joint venture depends on the parties’ intentions and each case must be evaluated on its own
circumstances. Adams, 754 S.W.2d at 713. 
      “A failure by the parties to agree to share losses precludes the existence of the joint venture.” 
Gutierrez, 650 S.W.2d at 172. If some evidence exists that a party incurred expenses pursuant
to an alleged joint venture agreement, a fact issue is created on this issue. See McCulley Fine Arts
Gallery, Inc. v. X Partners, 860 S.W.2d 473, 479 (Tex. App.—El Paso 1993, no writ). An
agreement to share losses will not be implied from an agreement to share profits, however. See
Brazosport Bank v. Oak Park Townhouses, 889 S.W.2d 676, 683 (Tex. App.—Houston [14th
Dist.] 1994, writ denied).
2. Factual Sufficiency of the Evidence
      We review the sufficiency of the evidence to support a trial court’s findings under the same
standards employed in reviewing a jury’s verdict. Catalina v. Blasdel, 881 S.W.2d 295, 297
(Tex. 1994). A factual sufficiency challenge requires us to consider and weigh all the evidence. 
Dyson v. Olin Corp., 692 S.W.2d 456, 457 (Tex. 1985); In re King’s Estate, 150 Tex. 662, 664-65, 244 S.W.2d 660, 661 (1951). We will set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust. Dyson, 692 S.W.2d at
457.
C. Application of the Law to the Facts
      Clarke’s eighth point challenges the factual sufficiency of the evidence to support the court’s
failure to find a partnership agreement. The evidence is largely undisputed that Clarke and
Lehtonen had an agreement on some issues when they began the project. Although the testimony
varied in degree, the evidence consistently reflected that they had a shared interest in seeing the
project through; that they made some decisions jointly; and that Clarke would be compensated
from the profits or rents from the apartments.
      Clarke’s version of events sharply diverges from Lehtonen in the area of how they would deal
with losses. Clarke testified in essence that the agreement concerning losses was that his share
of losses would be carried over to future periods when profits were realized and accounted for
prior to the distribution of his share of the profits. He conceded that the parties did not discuss
losses at length because they did not project any losses from the project.
      Lehtonen, on the other hand, denied any agreement regarding losses. The evidence reflects
that his wife and he were personally liable on the debt which they had incurred to renovate the
apartments and which was secured by the apartments. Clarke agrees that he is not personally
liable on the note, explaining that their joint venture was “responsible for the repayment of the
loan, but not the loan.”
      This evidence presented the court with a fact issue. See Tex-Co, 542 S.W.2d at 937. From
our review of the record, we cannot say that the court’s determination of this issue is clearly
wrong or unjust. See Dyson, 692 S.W.2d at 457. Accordingly, we overrule Clarke’s eighth
point.
      Clarke’s ninth point avers that Lehtonen failed to rebut the presumption created by section
7(4) of the Texas Uniform Partnership Act that evidence of profit sharing is prima facie evidence
of a partnership. Tex. Rev. Civ. Stat. Ann. art. 6132b, § 7(4). This argument fails for two
reasons. First, the parties do not dispute that Clarke never received any profits from the Polo
Club. To make the prima facie showing of section 7(4), a party must establish that he received
a share of the profits. Id. Clarke received nothing. Thus, he failed to make this prima facie
showing. Moreover, Lehtonen offered ample evidence by way of testimony and documents to
rebut Clarke’s evidence that the parties had a partnership or joint venture agreement. Thus, we
overrule Clarke’s ninth point.
V. THE REAL ESTATE LICENSE ACT
      Clarke’s third and fourth points respectively aver that the record contains neither legally nor
factually sufficient evidence to support the court’s finding that enforcement of the parties’ oral
agreement is barred by the RELA statute of frauds. See Tex. Rev. Civ. Stat. Ann. art. 6573a,
§ 20(b) (Vernon Supp. 1998) (“section 20(b)”). His thirteenth and fourteenth points respectively
challenge the factual and legal sufficiency of the evidence to support the court’s conclusion that
the parties’ agreement is indivisible. Clark contends in his sixteenth point that the court erred in
reaching this conclusion because “the issue of the intent of the parties with respect to the contract
is a factual issue which was not fully developed in the trial of the case.”
      Clarke argues in his fifth through seventh points that the court erred in finding and concluding
that section 20(b) has no exceptions. His twelfth and fifteenth points claim that the court’s
allegedly erroneous application of section 20(b) barred his recovery under the quantum meruit
theory. His tenth and eleventh points challenge the court’s “implied finding” that section 20(b)
bars enforcement of an oral partnership agreement.
A. The Pertinent Facts
            In a section of Clarke’s third amended petition designated “Factual Allegations,” Clarke
alleges that he performed the following tasks “in accordance with the agreement to form a
partnership”:
 
      ∙    accompanied Lehtonen to several financial institutions to meet with and assist in securing
of financing by preparing the necessary documentation to present to the financial
institution to secure the financing for the purchase and rehabilitation of the property;
 
      ∙    on at least two occasions accompanied Lehtonen to the offices of Met Life in Houston,
Texas, for the purpose of negotiating an earnest money contract for the purchase of the
property and was actively involved in the negotiation of the earnest money contract with
Met Life, the owner of the property in 1987;
 
      ∙    prepared construction estimates and proformas [sic] for presentation to financial
institutions, including Huntsville National Bank, the ultimate lender for the acquisition
of the property;
 
      ∙    secured bids and negotiated contracts with all subcontractors for the rehabilitation of the
property;
 
      ∙    provided all construction bookkeeping services during the rehabilitation of the property;
 
      ∙    used Plaintiff’s construction accounts at Furrow’s, U-Rent-M, Acme Glass, Butler
Building, Brazos Valley Lumber, Central Electric, and other suppliers for the
rehabilitation of the property;
 
      ∙    created and assisted in the filing of the partnership assume name [sic] of Polo Club
Apartments;
 
      ∙    opened and maintained a partnership operating and escrow account at First Bank & Trust
of Bryan, Texas;
 
      ∙    supervised construction by all subcontractors on the rehabilitation of the Polo Club;
 
      ∙    hired and trained leasing agents and all employees of the Polo Club;
 
      ∙    supervised the construction of the leasing office and hired and trained the employees
necessary to operate the leasing office;
 
      ∙    developed a marketing program to insure maximum occupancy of the Polo Club after
construction; and
 
      ∙    managed the operation of the Polo Club after completion of construction until Defendant
wrongfully removed him.

Clarke alleges that he performed all these services in reliance upon Lehtonen’s representation that
he would receive five percent of the net profits from the project in exchange for his services.
      Clarke testified that Lehtonen asked Clarke on May 12, 1987 “to continue on” with him in
the project to acquire, renovate and lease the apartments. According to Clarke, Lehtonen wanted
him to continue in a joint venture between themselves without their former joint venturers,
Chapman and Glockzin. In exchange, Clarke would receive five percent of the net profits from
the apartments and five percent of the proceeds if the project were sold or refinanced. From May
12 forward, Clarke continued to work on the project because of his agreement with Lehtonen.



      Clarke stated in his testimony that after May 12 he did the following in furtherance of his
agreement with Lehtonen:
      ∙    on May 19, he delivered pro forma documents to Robert McCann, a bank officer in
Huntsville who was considering Lehtonen’s request for financing;
 
      ∙    on May 20, Lehtonen and he met again with Met Life representatives to finalize the
earnest money contract and to review the asbestos reports;
 
      ∙    on May 21, he advised the appraiser by letter about the details of the project for purposes
of the appraisal and informed him that the appraisal needed to be completed “A.S.A.P.”;
 
      ∙    that night he prepared the final drafts of the renovation estimates and delivered them the
following morning to McCann in Huntsville;
 
      ∙    on May 27, he delivered additional pro forma documents to McCann in Huntsville;
 
      ∙    on May 28, Clarke drove to Huntsville, met with Lehtonen and the lenders,


 and returned
to College Station with them to inspect the premises of the apartment complex;
 
      ∙    on May 29, he spoke with the Met Life representative by phone regarding the status of
the loan (Lehtonen and Met Life executed the earnest money contract on the same date);
 
      ∙    on June 10, the parties closed the deal in two separate meetings: Lehtonen and his wife
executed the note and deed of trust at the bank in Huntsville, and Met Life executed a
special warranty deed to Lehtonen and his wife in College Station. According to
Lehtonen, Clarke attended the closing in College Station only.

Clarke consistently reiterated that he performed all these tasks because of his agreement with
Lehtonen and that he expected to be compensated for his work with five percent of the net profits
from the venture.
      Clarke testified that he had contact with representatives of Met Life on about fifty occasions
prior to the closing to discuss the purchase of the property or to gain access to the property to
personally view the property or to allow contractors on the premises to make bids or construction
estimates. According to Clarke, Met Life representatives also contacted him to inquire about the
status of the plan to purchase the property and whether they “were going to move forward with
it.” Met Life also sent Clarke a packet containing several documents relating to the sale of the
property including among other items: a proposed earnest money contract; a title policy from a
previous sale of the property; a survey; and an information sheet containing pertinent data about
the size, value, and current occupancy of the apartment complex.
      Clarke testified that Lehtonen and he reviewed the proposed earnest money contract and that
he arranged a meeting with Met Life representatives to discuss their concerns and to review
reports concerning an “asbestos problem relating to the apartments.” Clarke stated that he
“participated in the entire meeting” during which the parties negotiated the terms of the earnest
money contract, including the sales price. At Lehtonen’s request, Clarke hired an appraiser to
prepare a letter opinion for a bank which was considering lending Lehtonen the money necessary
to purchase the complex.
      According to Clarke, the appraiser relied in part on the construction estimates Clarke had 
drafted in preparing the letter opinion. He testified that he arranged a second meeting with Met
Life for the parties to reach a consensus on the terms of the earnest money contract and for
Lehtonen to review the asbestos reports. Clarke stated that he delivered several pro forma
documents the next day to Robert McCann, a bank officer in Huntsville who was considering
Lehtonen’s request for financing. He testified that he met with bank officers on three occasions
concerning the loan.
      Lehtonen disputed Clarke’s testimony in several respects. He testified that he asked Clarke
to continue with him on the apartment project as a manager. Lehtonen explained that he promised
to pay Clarke his costs during the renovation and five percent of gross rentals if Clarke’s
management company managed the apartments. He stated that Clarke’s authority over the project
was consistent with that of a project manager.
      Lehtonen discounted the extent of Clarke’s participation in dealing with Met Life or the bank
which financed the project. He testified that the extent of Clarke’s involvement in dealing with
Met Life was his attendance at the first meeting with Met Life representatives. He agreed that
Clarke had prepared the pro forma estimates and hired the appraiser. He stated that Clarke never
met with any bankers regarding the project.
      McCann confirmed Lehtonen’s recollection that he never met with Clarke or accepted delivery
of any loan documents from Clarke. However, his bank did not ultimately finance the project,
and he did not participate in the meeting at the bank which did finance the project, where Clarke
testified he reviewed the loan with Lehtonen and the bank officers.
      The trial court concluded that Clarke and Lehtonen had an oral contract which was indivisible
and which included in part services for the sale or purchase of real property. The court
determined that Clarke filed his suit to recover a commission for the services he rendered in
connection with Lehtonen’s purchase of the apartments. For these reasons, the court concluded
that enforcement of the entire contract is barred by the RELA statute of frauds. See Tex. Rev.
Civ. Stat. Ann. art. 6573a, § 20(b) (Vernon Supp. 1998) (“section 20(b)”). 
B. The Applicable Law
1. Judicial Admissions
      Lehtonen argues that the factual allegations of Clarke’s petition set forth above constitute
judicial admissions which support the court’s judgment. Factual allegations set forth in a party’s
live pleadings are considered judicial admissions. Houston First Am. Sav. v. Musick, 650 S.W.2d
764, 769 (Tex. 1983); Huff v. Harrell, 941 S.W.2d 230, 235 (Tex. App.—Corpus Christi 1996,
writ denied). Generally, such pleadings are binding on the party who makes them and cannot be
controverted. Marshall v. Vise, 767 S.W.2d 699, 700 (Tex. 1989); Musick, 650 S.W.2d at 769. 
Judicial admissions conclusively establish the facts pleaded and thus relieve the opposing party of
the necessity of proving the admitted facts. Chilton Ins. Co. v. Pate & Pate Enter., Inc., 930
S.W.2d 877, 884 (Tex. App.—San Antonio 1996, writ denied). In order to preserve the binding
effect of such admissions however, the party relying on them must object to the admission of any
evidence which contradicts the pleaded facts and in a jury trial must object to the submission of
any question related to the fact admitted. Marshall, 767 S.W.2d at 700; Musick, 650 S.W.2d at
769; Huff, 941 S.W.2d at 235.
      A party’s factual pleadings are also admissible under the rules of evidence as statements of
a party opponent. Westchester Fire Ins. Co. v. Lowe, 888 S.W.2d 243, 251-52 (Tex.
App.—Beaumont 1994, no writ) (on rehearing); Tex. R. Civ. Evid. 801(e)(2), 46 Tex. B.J. 209
(Tex. 1982, repealed 1998).


 If a party testifies in a manner contrary to the factual allegations of
his pleadings, that party can be impeached with the pleadings as prior inconsistent statements. 
Huff, 941 S.W.2d at 239; Lowe, 888 S.W.2d at 251-52; Tex. R. Civ. Evid. 613(a), 46 Tex. B.J.
208 (Tex. 1982, repealed 1998).
2. Legal Sufficiency of the Evidence
      When we decide a legal sufficiency or “no evidence” point, we consider only the evidence
and inferences which tend to support the contested issue and disregard all evidence and inferences
to the contrary. Havner v. E-Z Mart Stores, Inc., 825 S.W.2d 456, 458 (Tex. 1992). We must
uphold the verdict if we find any probative evidence supporting the issue. Southern States
Transp., Inc. v. State, 774 S.W.2d 639, 640 (Tex. 1989).
3. Divisibility of Contracts
      A contract which involves in part a commission for the sale or purchase of real property and
which is indivisible is subject to the requirements of section 20(b). Stroble v. Tearl, 148 Tex.
146, 152, 221 S.W.2d 556, 559 (1949); Anderson v. Republic Life Ins. Co., 623 S.W.2d 162, 165
(Tex. App.—Fort Worth 1981, no writ); Manering v. North Tex. Producers Ass’n, 370 S.W.2d
939, 940-41 (Tex. Civ. App.—Fort Worth 1963, writ ref’d n.r.e.). The divisibility of a contract
rests primarily on the parties’ intentions, the subject matter of the contract, and the parties
conduct. Johnson v. Walker, 824 S.W.2d 184, 187 (Tex. App.—Fort Worth 1991, writ denied).
      The courts have frequently examined whether the consideration for an agreement is
apportionable to determine the divisibility of the contract. See Stroble, 148 Tex. at 152, 221
S.W.2d at 559; Lake LBJ Mun. Util. Dist. v. Coulson, 771 S.W.2d 145, 153 (Tex. App.—Austin
1988), rev’d on other grounds, 781 S.W.2d 594 (Tex. 1989); Hamilton v. Texas Oil & Gas Corp.,
648 S.W.2d 316, 320 (Tex. App.—El Paso 1982, writ ref’d n.r.e.); Chapman v. Tyler Bank &
Trust Co., 396 S.W.2d 143, 147 (Tex. Civ. App.—Tyler 1965, writ ref’d n.r.e.). “The essential
feature of a divisible contract is that a portion of the price is set off against a portion of the
performance; therefore, when a part of the performance has been rendered, a debt for that part
immediately arises.” F.D. Stella Prod. Co. v. Scott, 875 S.W.2d 462, 466 (Tex. App.—Austin
1994, no writ) (citing 6 Samuel Williston & Walter H. E. Jaeger, A Treatise on the Law
of Contracts § 861 (3d ed. 1962)).
4. The Sale or Purchase of Real Estate
      Section 20(b) provides:
(b) An action may not be brought in a court in this state for the recovery of a commission
for the sale or purchase of real estate unless the promise or agreement on which the
action is brought, or some memorandum thereof, is in writing and signed by the party to
be charged or signed by a person lawfully authorized by the party to sign it.

Tex. Rev. Civ. Stat. Ann. art. 6573a, § 20(b). Assuming an enforceable contract under section
20(b), a broker cannot recover a commission in a transaction involving the sale of real property
unless the broker was the procuring cause of the sale. Goodwin v. Gunter, 109 Tex. 56, 63, 195
S.W. 848, 849 (1917) (on rehearing); Tower View, Inc. v. Hopkins, 679 S.W.2d 632, 635 (Tex.
App.—San Antonio 1984, writ ref’d n.r.e.); Sherman v. Bruton, 497 S.W.2d 316, 320 (Tex. Civ.
App.—Dallas 1973, no writ). Texas courts have identified three methods by which a broker might
be considered the procuring cause of the sale:
      (1)  by procuring a contract from a purchaser on the terms proposed by the seller;
      (2)  by procuring a purchaser to whom a sale is made on terms agreeable to the
seller; or
 
      (3)  by producing a purchaser who is ready, willing and able to buy on terms
specified in the brokerage contract and who offers to do so.

Fuess v. Mueller, 630 S.W.2d 715, 717 (Tex. App.—Houston [1st Dist.] 1982, no writ);
Anderson-Berney Bldg. Co. v. Swan, 133 S.W.2d 269, 274 (Tex. Civ. App.—Fort Worth 1939,
writ dism’d judgm’t cor.).
      Regarding the second of these methods, Texas courts have held:
It is not necessary that a broker should negotiate the sale when he has found, or he has
introduced or given a name of, a purchaser who is able, willing and ready to purchase
the property upon the terms named by the principal, and the principal has entered into
negotiation with such purchaser and concluded a sale with him.

Poppe v. Camelot Properties, Inc., 711 S.W.2d 101, 106 (Tex. App.—Austin 1986, writ ref’d
n.r.e.); accord Keener v. Cleveland, 250 S.W. 151, 152 (Tex. Comm’n App. 1923, judgm’t
adopted); Shepard v. Wesson, 266 S.W.2d 393, 395 (Tex. Civ. App.—Amarillo 1953, no writ).
5. Action for the Recovery of a Commission
      Section 20(b) applies to any action brought “for the recovery of a commission.” Tex. Rev.
Civ. Stat. Ann. art. 6573a, § 20(b). The Real Estate License Act does not define the term
“commission.” Thus, we will apply that term’s ordinary meaning. See Tex. Gov’t Code Ann.
§ 312.002(a) (Vernon 1988). Black’s Law Dictionary defines a commission in pertinent part as:
Compensation. The recompense, compensation or reward of [a] . . . broker . 
. . when the same is calculated as a percentage on the amount of his transactions or on
the profit to the principal.

Black’s Law Dictionary 272 (6th ed. 1990). Thus, section 20(b) applies to any suit brought
for the purpose of recovering a commission for the sale of real property which is calculated as a
percentage of the profit to the principal resulting from the transaction.
6. Exceptions to Section 20(b)
      Texas courts traditionally have strictly construed section 20(b). See Trammell Crow Co. No.
60 v. Harkinson, 944 S.W.2d 631, 637 (Tex. 1997). The courts have rejected the equitable
doctrines of promissory estoppel, partial performance, and quantum meruit as exceptions to
section 20(b). Id. at 636 (promissory estoppel); Boyert v. Tauber, 834 S.W.2d 60, 63-64 (Tex.
1992) (partial performance); Landis v. W.H. Fuqua, Inc., 159 S.W.2d 228, 230-31 (Tex. Civ.
App.—Amarillo 1942, writ ref’d) (quoted with approval by Trammell Crow, 944 S.W.2d at 636)
(quantum meruit).
      The underlying purpose of section 20(b) is to prevent fraud and uncertainty in transactions
involving brokers. See Hitchcock Properties, Inc. v. Levering, 776 S.W.2d 236, 238 (Tex.
App.—Houston [1st Dist.] 1989, writ denied); accord Clements v. Withers, 437 S.W.2d 818, 821
(Tex. 1969). To permit court-created exceptions to the statute “would be in direct opposition to
the expressed will of the Legislature and would unduly expose the public to fraudulent claims for
commissions.” Trammell Crow, 944 S.W.2d at 636.
      Although traditional equitable exceptions applicable to other statutes of frauds do not apply
to section 20(b), the courts have excepted certain transactions from the RELA. Historically, the
requirements of the RELA have not applied to transactions between parties “engaged as joint
venturers.” See Kaiser Gypsum Co. v. Jordan, 399 S.W.2d 588, 591 (Tex. Civ. App—Waco
1966, writ ref’d n.r.e.); accord Mummert v. Stekoll Drilling Co., 352 S.W.2d 526, 527 (Tex. Civ.
App.—Dallas 1961, writ ref’d n.r.e.); Coats v. Windham, 254 S.W.2d 530, 534 (Tex. Civ.
App.—Beaumont 1953, writ ref’d n.r.e.); Gill v. Smith, 233 S.W.2d 223, 227 (Tex. Civ.
App.—Galveston 1950, writ ref’d n.r.e.); see also Tex. Rev. Civ. Stat. Ann. art. 6573a, § 3(12)
(Vernon Supp. 1998) (excepting partnerships from the RELA).
Application of the Law to the Facts
1. The Divisibility of the Parties’ Agreement
      Clarke testified consistently with his trial pleadings concerning the nature of his agreement
with Lehtonen, the services he performed pursuant to that agreement, and the compensation he
expected to receive in exchange for the services he performed. Thus his pleadings constitute
judicial admissions. See Huff, 941 S.W.2d at 230. According to Clarke’s pleadings and
testimony, he agreed with Lehtonen to assist in the acquisition, renovation, and operation of the
apartment complex for five percent of the net profits from the apartments. This single
consideration was not apportionable among the various services Clarke undertook to perform
pursuant to the parties’ agreement.
      Clarke’s pleadings and testimony provided the court ample probative evidence that the parties’
agreement was indivisible. See Stroble, 148 Tex. at 152, 221 S.W.2d at 559; Scott, 875 S.W.2d
at 466; Coulson, 771 S.W.2d at 153. Thus, the trial court’s conclusion on this issue is supported
by legally sufficient evidence. See Southern States Transp., 774 S.W.2d at 640. Accordingly,
we overrule Clarke’s fourteenth point.
      As judicial admissions, Clarke’s pleadings conclusively established this issue. Thus, the trial
court’s conclusion that the parties’ agreement was indivisible is supported by factually sufficient
evidence. See Lancer Corp. v. Murillo, 909 S.W.2d 122, 127-28 (Tex. App.—San Antonio 1995,
no writ); Dobbins v. Coruthers, 864 S.W.2d 754, 755-57 (Tex. App.—Houston [1st Dist.] 1993,
no writ). Accordingly, we overrule Clarke’s thirteenth point.
      Clarke contends in his sixteenth point that the court erred in concluding that the parties’
agreement was indivisible because the evidence on the parties’ intent concerning the contract was
not fully developed at trial. However, Clarke never asked the trial court to permit him to reopen
and present additional evidence on this issue. See C.F. v. State, 897 S.W.2d 464, 473 (Tex.
App.—El Paso 1995, no writ); Guerrero v. Standard Alloys Mfg. Co., 598 S.W.2d 656, 658 (Tex.
Civ. App.—Beaumont 1980, writ ref’d n.r.e.); Tex. R. Civ. P. 270. Accordingly, we conclude
that he has failed to preserve this issue for our review. See Tex. R. App. P. 52(a), 49 Tex. B.J.
573 (Tex. 1986, repealed 1997). We overrule Clarke’s sixteenth point.
2. Section 20(b)
      We have already determined that Clarke’s trial pleadings constitute judicial admissions. As
such, the pleadings and his testimony alone provide ample probative evidence to support a finding
that Clarke introduced Met Life and Lehtonen and that they subsequently negotiated a deal
agreeable to Met Life. See Poppe, 711 S.W.2d at 106; Fuess, 630 S.W.2d at 717; Swan, 133
S.W.2d at 274. Thus, the evidence is legally sufficient to support the trial court’s finding that the
parties’ agreement involved the sale or purchase of real property. See Southern States Transp.,
774 S.W.2d at 640.
      As judicial admissions, Clarke’s pleadings conclusively established this issue. Thus, the trial
court’s finding is supported by factually sufficient evidence. See Murillo, 909 S.W.2d at 127-28;
Dobbins, 864 S.W.2d at 755-57.
      Clarke’s pleadings and testimony also establish without dispute that he seeks compensation
of five percent of the net profits from the operation of the apartments. Thus, the evidence is
legally and factually sufficient to support the trial court’s conclusion that Clarke instituted this
action to recover a commission. See Black’s Law Dictionary at 272.
      The evidence supports the trial court’s findings and conclusions that Clarke brought this suit
for a commission on the basis of an oral agreement involving the sale or purchase of real property.
The agreement between Clarke and Lehtonen involved more than just the sale or purchase of real
property. It also involved the renovation and operation of the apartments. However, we have
already determined that the evidence supports the trial court’s conclusion that the agreement is
indivisible. Thus, section 20(b) bars the enforcement of the parties’ oral agreement. Stroble, 148
Tex. at 152, 221 S.W.2d at 559; Anderson, 623 S.W.2d at 165. We overrule Clarke’s third and
fourth points.
3. Exceptions to Section 20(b)
      Clarke argues in his fifth through seventh points that the court erred in finding and concluding
that section 20(b) has no exceptions. His twelfth and fifteenth points claim that the court’s
allegedly erroneous application of section 20(b) barred his recovery under the quantum meruit
theory. His tenth and eleventh points challenge the court’s “implied finding” that section 20(b)
bars enforcement of an oral joint venture agreement.
      Clarke asserts that he sufficiently pled and proved partial performance, promissory estoppel
and quantum meruit as exceptions to section 20(b). However, these equitable theories have been
rejected as exceptions to the requirements of the statute. Trammell Crow, 944 S.W.2d at 636
(promissory estoppel); Boyert, 834 S.W.2d at 63 (partial performance); Landis, 159 S.W.2d at
230-31 (quantum meruit). Accordingly, we overrule Clarke’s fifth, sixth, seventh, twelfth, and
fifteenth points.
      Clarke also argues that Lehtonen and he had an oral joint venture agreement. Section 20(b)
does not apply to transactions between joint venturers. Kaiser Gypsum, 399 S.W.2d at 591. 
Accordingly, the court erred by implicitly concluding that section 20(b) bars enforcement of an
oral joint venture agreement. However, because Clarke failed to produce sufficient evidence to
establish a joint venture, we conclude that the court’s error in reaching this implicit conclusion is
harmless. See Tex. R. App. P. 81(b)(1), 49 Tex. B.J. 581 (Tex. 1986, repealed 1997). Thus, we
overrule Clarke’s tenth and eleventh points.
VI. CONCLUSION
      The trial court vacated its original judgment while still within its plenary power. It then
rendered judgment that Clarke take nothing because his suit sought a commission on an oral
contract involving the sale of real estate. We have overruled all of Clarke’s points. Because we
are affirming the judgment, we need not address the cross-point raised by Lehtonen. See
Gregorcyk v. Al Hogan Builder, Inc., 884 S.W.2d 523, 526 (Tex. App.—Corpus Christi 1994,
writ denied); Tex. R. App. P. 90(a), 49 Tex. B.J. 583 (Tex. 1986, repealed 1997). We affirm the
judgment.
 
                                                                               REX D. DAVIS
                                                                               Chief Justice


Before Chief Justice Davis
      Justice Cummings and
      Justice Vance
Affirmed
Opinion delivered and filed July 1, 1998
Do not publish